Filed 2/24/14  BP West Coast Products v. Azari CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **BP WEST COAST PRODUCTS LLC et al.,** | |
| **Plaintiffs and Respondents,** | **A135829** |
| **v.** | |
| **KAMAL Y. AZARI et al.,** | **(Solano County Super. Ct. No. FCS 035180)** |
| **Defendants and Appellants.** | |

Kamal Azari and Pari Azari appeal from an order adding them as judgment debtors, in their capacity as trustees for their family trust, to a judgment obtained against Kamal Azari individually.  (See Code Civ. Proc., § 187.)  Appellants contend the evidence did not support the order and the amended judgment is void.  We will affirm.[1]

I. FACTS AND PROCEDURAL HISTORY

Kamal Azari (Azari) and respondent BP West Coast Products LLC (BP) were parties to certain franchise agreements by which Azari operated a gasoline station and

---

[1]  Respondent filed a motion to augment the record and a request for judicial notice on June 25, 2013.  We granted the motion to augment, deemed the record on appeal to be augmented to include a copy of the documents attached to the motion, and deferred our ruling on the request for judicial notice.  Because the request for judicial notice pertains to the same documents as the motion to augment, we now deny the request for judicial notice as moot.

convenience store in Vallejo. BP also loaned Azari $525,000 pursuant to two written loan agreements; Azari signed promissory notes that were secured by a deed of trust on the station property.

### A. *BP's Complaint*

In February 2010, BP filed a lawsuit against Azari to recover $82,593.85 for unpaid gasoline deliveries, royalties, advertising, and maintenance charges under the franchise agreements, $249,861 for outstanding loan payments, and prejudgment interest, costs, and attorney fees. BP also sought $123,284.29 in liquidated damages in connection with Azari's termination of his franchise. The complaint included a cause of action for breach of the franchise agreements, a common count for goods sold and delivered, and a claim for foreclosure of the deed of trust on the station property.

### B. *Azari's Cross-Complaint*

Azari filed a cross-complaint and amended cross-complaint, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and violation of statute. Azari's declaratory relief claim represented that a judicial declaration was necessary for Azari to "ascertain his rights and duties under the deed of trust and protect *his* property from foreclosure." (Italics added.)

### C. *Trial and Judgment*

At trial, Azari did not dispute that he owed BP $49,731.68 for unpaid gasoline deliveries and $32,861.17 for unpaid franchise fees; his primary defense was that BP caused him to withhold payment when it deprived him of two bills of lading regarding two loads of gasoline that it had sold and delivered to him.

Nor did Azari claim at trial that he was unable to pay BP due to a lack of personal assets or cash flow. To the contrary, he emphasized his substantial personal wealth and financial wherewithal, introducing his personal bank records to indicate that he had millions of dollars at his disposal. Furthermore, Azari did not disclose that the station property at the heart of BP's foreclosure claim was no longer owned by Azari, but by a family trust.

2

The court issued its tentative decision in August 2011.  Azari filed a "Request for Statement of Decision and Objections."  The court overruled Azari's objections and ordered judgment in favor of BP and against Azari on all causes of action alleged in BP's complaint and Azari's operative cross-complaint.  Judgment was entered against Azari in the sum of $648,703.20.

Azari appealed from the judgment in December 2011 (No. A134076).  The appeal was dismissed in January 2012 due to Azari's failure to designate the record on appeal.

D. *Azari's Posttrial Communications Regarding His Assets*

Not long after judgment had been entered against him, Azari finally disclosed that his assets were held in the family trust, and he had no funds to pay the judgment.

1. The November 2011 Smith Letter

BP's attorney, John Arya, received a letter from Azari's business consultant, Robert L. Smith, dated November 25, 2011 (Smith Letter).  The letter, written on Azari's behalf, advised BP that Azari and his wife had transferred to their family trust—later identified as "The Kamal and Pari Azari 2003 Living Trust, dated 5-15-03" (Azari Trust)—all of the Azaris' personal assets, including the station property that was the subject of BP's foreclosure claim.  The letter further admonished that, in light of the Azari Trust's ownership of these assets, BP's remedies were "limited, difficult and expensive to assert," and proposed a settlement of the judgment against Azari based on the potential sale of the station property that belonged to the Azari Trust.  The Smith Letter also represented that Azari now had an approximate net worth of just about $6,300, but the Azari Trust had net assets of approximately $6.4 million.[2]

---

[2]   The Smith Letter stated in part:

"As you are aware Kamal and his wife have a family trust, that was established in 2009.  All of their personal assets were transferred into the trust in early 2009, as a part of a comprehensive estate plan and without any anticipation of litigation with BP. The service station (333 Curtola Parkway) was transferred to the trust by a deed dated February 9, 2009 and recorded October 20, 2009.  There are no liquid assets or other holdings in the trust capable of conversion into cash or that are readily saleable.

2.  The January 2012 Azari E-mail

In correspondence to BP's counsel dated January 11, 2012 (January e-mail), Azari claimed that the trial evidence of his substantial personal assets reflected a misrepresentation to the court by his lawyer.  Azari stated: "I am currently diligently working towards liquidation of the station in order to generate liquidity.  No cash monies exist.  Acknowledge that during the trial Attorney Lewis represented to the Court a different picture of my financial status than what reality is."

E.  *BP's Amendment of the Judgment to Add the Azaris as Trustees*

On January 27, 2012, after receiving the Azari's January e-mail, BP filed a motion to amend the judgment by adding "Kamal and Pari Azari, [in their capacity] as Trustees

---

"The trust's assets consist primarily of various parcels of real property, the house and winery, a vacant parcel, and various improved commercial and residential properties.  The trust's net worth is but a mere fraction of the values attributed to Kamal in 2007 or 2008.  I am informed that a fair estimate of the net worth of the trust's property, after deducting encumbrances of record is approximately [$6.4 million].

"The remedies available to BP as a judgment creditor in this matter are limited, difficult and expensive to assert and, as is the situation with the deed of trust on 333 Curtola Parkway, subject to prior liens of record.  Without ready cash, or other available liquid assets, the only apparent solution is through the sale of one or more of the properties.  The obvious first choice being the service station site.

"Accordingly, I am authorized on behalf of Kamal Y. Azari to submit the following proposal.  The parties shall enter into a stipulation providing that Kamal will pay [BP] the sum of $525,000 on or before December 31, 2012, payable through proceeds of sale of the service station directly from escrow.  If the station is not sold on or before December 31, 2012, the sum of $625,000 on or before December 31, 2013, shall become payable from proceeds of sale of the service station directly from escrow.  If the station is not sold on before December 31, 2013 then the amounts due under the judgment shall become all due and payable.  After satisfaction of the existing first deed of trust in favor of Scott Valley Bank (approximate principal balance of [$1.6 million]), taxes, and expenses of sale [BP] shall receive the sum of $525,000 if the sale is prior to December 31, 2012 or $625,000 provided the sale is prior to December 31, 2013.  The service station (333 Curtola Parkway) shall be listed for sale and aggressively marketed."  The letter stated that "the comments and representations contained herein are made subject to the provisions of [Evidence Code] § 1152."

4

of the Kamal and Pari Azari 2003 Living Trust dated 5-15-03" as judgment debtors.  The motion was brought on the ground that Azari was the alter ego and trustee of the Azari Trust, and the amendment was necessary to avoid injustice.

In support of its motion, BP submitted a declaration by Arya, recounting Azari's trial testimony about his assets and noting that Azari "introduced as trial exhibits his personal bank records to reflect that at all relevant times he had millions of dollars of cash at his ready disposal."  Arya's declaration also noted there was no mention at trial that the station property was owned by the Azari Trust, rather than Azari.  Attached to Arya's declaration was the November 2011 Smith Letter, advising of the transfer of the Azaris' assets to their family trust, and the January 2012 Azari e-mail, indicating that Azari's attorney had misstated Azari's finances at trial.

Azari opposed BP's motion to amend on March 2, 2012, contending that he performed the acts alleged in BP's complaint on his own behalf and he did not represent the trust's interests.  Azari's accompanying declaration asserted: he and his wife created the Azari Trust in 2003 as part of an estate plan; the station property was transferred by a deed recorded in October 2009, before he had any "inclination" that BP would commence litigation against him;[3] on January 27, 2010—shortly before BP filed its complaint—the Azaris amended the Azari Trust to make it irrevocable; on January 30, 2012—just four days after BP served its motion to amend the judgment—the Azaris executed a second trust amendment that again described the trust as irrevocable and represented that they had resigned as trustees and appointed Integrated Capital Management LLC (ICM) as the trustee; Azari had authorized Smith to write the letter to Arya in order to settle the lawsuit; Azari acted on his own behalf rather than on behalf of the trust; and the financial data presented at trial pertained to "2001-2007."  Pari Azari also submitted a declaration, stating that she had only minimal knowledge of the litigation, did not participate in pretrial planning or exercise control over trial preparation, and had little involvement in

---

[3]  It is not clear how the transfer of the station property occurred, since BP had a deed of trust on the property.  There is no indication that notice was given to BP.

the trial. In addition, Azari filed a motion to strike the Smith Letter based on Evidence Code section 1152.

BP filed a reply, supported by declarations averring that the Azaris had not brought documents pertaining to the trust to their judgment debtors' examinations because, they claimed, they had turned over the documents to ICM shortly before the examinations.

After a hearing, the court issued its written order on March 23, 2012, granting BP's motion and ordering that the judgment be amended to include "Kamal Azari and Pari Azari, as Trustees of the Kamal and Pari Azari 2003 Living Trust dated 5-15-03," as judgment debtors. The amended judgment was filed on the same date.

"Defendants Kamal Azari and Pari Azari" thereafter filed a notice of appeal from the amended judgment.

F. *Azari's Continuing Protection of Azari Trust Assets*

BP proceeded to attempt enforcement of the amended judgment, recording abstracts of judgment and obtaining a writ of sale for the station property. In January 2013 after notice, the station property was sold at a foreclosure sale to an Azari "employee or associate" for just $100.

Azari then acted to protect the other assets of the Azari Trust from enforcement. In May 2013, Azari filed a motion to stay the levy, sale or other distribution of real property owned by the trust, and to recall and stay execution of all writs of execution until resolution of this appeal. In June 2013, long after the Azari Trust had purportedly been made irrevocable and Azari had resigned as trustee, Azari confirmed that he nonetheless continued to represent and defend the Azari Trust's interests. In particular, he asserted: "Azari is not appealing the judgment against him personally. Instead, Azari is appealing to *protect the rights* of the *Trustees of the Kamal and Pari Azari 2003 Living Trust Dated May 15, 2005* ('Trust'). In the appeal, Azari will seek to *protect the rights* of the Trust and its beneficiaries from the Trust's addition as an additional defendant in the Amended Judgment." (First and third italics added.)

6

II.  DISCUSSION

Under the authority of Code of Civil Procedure section 187 (section 187), a court may amend a judgment at any time so that it designates the true defendants.  (*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2012) 212 Cal.App.4th 1181, 1188 (*Carolina Casualty*).)  For example, the alter ego of an original judgment debtor may be added as an additional judgment debtor.  (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 508 (*Greenspan*).)  " ' "Amendment of a judgment to add an alter ego 'is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant. . . .  "Such a procedure is an appropriate and complete method by which to bind new . . . defendants where it can be demonstrated that in their capacity as alter ego of the [original judgment debtor] they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit." . . . ' . . . " ' [Citations.]"  (*Ibid.*)

Furthermore, even if the requirements for an alter ego finding cannot be established, a judgment may be amended under section 187 to add a new judgment debtor where necessary to prevent injustice.  (*Carolina Casualty, supra*, 212 Cal.App.4th at pp. 1188-1189; *Carr v. Barnabey's Hotel Corp.* (1994) 23 Cal.App.4th 14 (*Carr*).)

We review a trial court's decision to amend the judgment under section 187 for an abuse of discretion; factual findings necessary to the court's decision are reviewed for substantial evidence.  (*California Casualty, supra*, 212 Cal.App.4th at p. 1189.)

A.  *Substantial Evidence of Alter Ego*

Under an alter ego theory, a judgment may be amended to include the trustees of a trust as judgment debtors, so the judgment creditor can reach the assets of the trust to satisfy the judgment.  (See *Greenspan, supra,* 191 Cal.App.4th at p. 518.)  As applied here, the question in the trial court was whether the proposed judgment debtors (Azari and his wife, as trustees of the Azari Trust) were the alter ego of the original judgment debtor (Azari); if so, Azari could be considered the owner of the Azari Trust's assets for

7

purposes of satisfying the judgment, and the trust's trustees could rightfully be named as judgment debtors. (*Greenspan, supra*, 191 Cal.App.4th at p. 522.)[4]

Substantial evidence supports the conclusion that Azari and his wife, as trustees of the Azari Trust, were the alter ego of Azari at all relevant times. Azari, as an individual, is of course the same human being who held the position of trustee of the Azari Trust. Moreover, there was a unity of interest between Azari individually and the Azaris as trustees, such that they were indistinguishable for all intents and purposes.

First, substantial evidence supports the conclusion that Azari exercised control over the trust assets as trustees would, with the trustees' consent. He and his wife created the Azari Trust, transferred all their assets to the trust (including the station property that was the subject of the litigation), and appointed themselves trustees. By virtue of their role as trustees, Azari and his wife held title to the assets that they had transferred into the trust and continued to control those assets.

Azari's control over trust assets—and his willingness to use trust assets for his personal benefit—continued despite the Azaris' show of making the trust "irrevocable."[5] Although in January 2010—just a few days before BP filed its complaint—the Azaris purported to amend the Azari Trust documents to state that the trust "shall be irrevocable," other terms of the trust show that it remained revocable in effect, and the

---

[4]  To enforce the judgment against the Azari Trust, the judgment must identify as judgment debtors the trustees of the trust, not the trust itself. (See *Portico Management Group, LLC v. Harrison* (2011) 202 Cal.App.4th 464, 473-474.) Furthermore, because a trust is not a legal entity, and because it is the trustee who holds legal title to the property for the benefit of the trust beneficiaries, it is the trustee rather than the trust that can be an alter ego. (*Greenspan, supra*, 191 Cal.App.4th at pp. 518, 521-522.) Nonetheless, if we phrased the issue as whether Azari was the alter ego of the Azaris as trustees (or vice versa), or whether Azari was the alter ego of the Azari Trust (or vice versa), our conclusion in this case would be the same: the court did not abuse its discretion in adding the Azaris as trustees to the judgment as judgment debtors, so that BP could attempt to satisfy the amended judgment with the assets of the Azari Trust.

[5]  The ostensible purpose of making the trust irrevocable was to protect the trust assets from any judgment BP might obtain: a judgment creditor may enforce its judgment against assets held by the judgment debtor in a *revocable* trust. (Prob. Code, § 18200.)

assets remained under Azari's control. The amendments by which the Azaris declared the trust irrevocable specified that "[t]he *remaining* terms contained in this Trust are hereby affirmed in their entirety, and shall remain in full force and effect." (Italics added.) One of those remaining terms—Article VI.A.—provides that "[t]he trustee shall also deliver as much of the community property to the Trustors as they jointly request in a written statement delivered to the Trustee." In addition, Article VI.B. provides that all income from the Azari Trust "shall" be distributed, and that "[t]he Trustee shall also deliver to the Trustor whose separate property was transferred to the trust as much of the principal of that Trustor's separate property as that Trustor requests in a written instrument delivered to the Trustee." Furthermore, the Azaris maintained the right to amend the terms of the trust by their written consent. In short, Azari and his wife still had the power to distribute the trust assets to themselves.

Second, throughout the litigation with BP, Azari zealously protected the trust assets as a trustee would, even when contrary to his interests as an individual. For example, knowing that title to the station property was held not by Azari but by the Azari Trust trustees, Azari could have sought dismissal of the foreclosure claim against him. Instead, he withheld the fact that he did not hold title to the property, declined to advance his own interests by arguing that the transfer of the property precluded the foreclosure claim against him, and affirmatively filed a cross-complaint representing that a declaratory judgment was necessary to "ascertain his rights and duties under the deed of trust and protect *his* property from foreclosure." (Italics added.) Since Azari had essentially no assets during the litigation, the assets he was protecting in defending against BP's lawsuit were really assets of the Azari Trust; effectively, he was acting at least in part as a trustee in the litigation with BP.

Azari's representation and defense of the Azari Trust continued after the trial. Azari opposed BP's efforts to amend the judgment in a manner that would expose the trust assets. As appellants now put it in their opening brief in this appeal, Azari was "excessively zealous" in protecting the assets of the Azari Trust in the litigation.

9

Furthermore, although occurring after the court ruled on the motion to amend, Azari sought a stay of BP's enforcement of the amended judgment against the Azari Trust's property months after he purportedly resigned as trustee, and he continues to litigate in this court to protect the trust's assets.

Indeed, the Smith Letter captures perfectly the control Azari continued to wield over the assets of the Azari Trust, and his willingness to use the trust assets for his own purposes: Azari authorized Smith to settle *Azari's* liability under the judgment with the property of the Azari Trust—on a date after the trust had reportedly become irrevocable.

In short, the evidence is overwhelming that Azari, and Azari and his wife as trustees of the Azari Trust, were alter egos: Azari controlled the litigation against BP, representing and defending the interests of the Azari Trust; and he also controlled the trust assets, proposing to use them for his own benefit. As such, the Azari Trust and its trustees effectively controlled the litigation, the Azari Trust held the assets at stake, and both Azari and the trust treated the station property and other assets as belonging to one or the other depending on what best suited their needs at the time. Accordingly, the Azari Trust trustees should be identified as judgment debtors so that the Azari Trust assets can be reached by BP. (See *Greenspan, supra*, 191 Cal.App.4th at pp. 508-510.)

Appellants' arguments to the contrary are meritless. They contend the Smith Letter (advising that the Azaris' personal assets had been transferred into the family trust) was inadmissible, because the letter stated it was "made subject to the provisions of [Evidence Code section] 1152." However, Evidence Code section 1152, subdivision (a) provides that evidence of a party's settlement offer and conduct or statements made during negotiations is "inadmissible to prove his or her liability for the loss or damage or any part of it." The Smith Letter was not offered to prove Azari's liability (as an individual or trustee) for BP's loss or damage. It was offered after trial to show that Azari's assets had been transferred to the trust, such that the judgment could not be satisfied against Azari in his individual capacity. Besides, any error in admitting the Smith Letter was harmless, since Azari asserted *in his own declaration* the fact of his transfer of the assets into the trust and the settlement authority he conveyed to Smith.

10

Appellants also argue that the statements by BP's attorney (Arya) in his declaration—recounting that Azari did *not* disclose at trial that the station property was owned by the trust or that Azari would be unable to satisfy his debt to BP—were hearsay. It is unclear how something that was *not* said could be hearsay. But in any event, the objection was waived and forfeited by Azari's failure to object in the trial court. (Evid. Code, § 353.)

The court did not abuse its discretion in amending the judgment based on an alter ego theory.

B. *Substantial Evidence of Overwhelming Equities*

Even if the alter ego theory were not applied, the court's amendment of the judgment would be appropriate in equity to avoid injustice. (*Carolina Casualty, supra*, 212 Cal.App.4th at pp. 1188-1189 ["if all the formal elements necessary to establish alter ego liability are not present, an unnamed party may be included as a judgment debtor if 'the equities overwhelmingly favor' the amendment and it is necessary to prevent an injustice"].)

The equities overwhelmingly favor the amendment of the judgment. Shortly before BP filed its complaint, the Azaris purported to make their trust, containing all their assets, irrevocable. Still believing that Azari owned the station property, BP pursued its lawsuit against Azari rather than the trustees of the Azari Trust. During the trial, while Azari was still a trustee of the Azari Trust, Azari defended against BP's claims as if he owned the station property, without disclosing the transfer. In fact, Azari expressly represented that he was defending his *own* property in the litigation, leading BP and the court to believe that his own assets were at stake. After judgment was entered against him, Azari finally disclosed that he had no money, and the assets were in the trust, in an attempt to negotiate a favorable settlement. And within days after BP's service of its motion to amend the judgment to include the Azaris as trustees, the Azaris purported to resign as trustees and attempted to dissuade the court from amending the judgment to reflect the true owner of the property and other assets. Equity supports the conclusion that the assets of the Azari Trust should be available to BP to satisfy the judgment.

11

Instructive in this regard is *Carolina Casualty, supra*, 212 Cal.App.4th 1181. There, an insurer had obtained a judgment for certain amounts in a coverage action against a law firm (Ross Law Group). (*Id*. at pp. 1184-1186.) Ross Law Group refused to satisfy the judgment, asserting it had ceased operations before it settled the underlying litigation and had no assets. The trial court amended the judgment by adding an individual (Ross) as a judgment debtor. (*Id*. at p. 1187.) The appellate court affirmed, finding substantial evidence that Ross actively participated in and controlled the litigation on behalf of Ross Law Group, encouraged the lawsuit to proceed against the law firm to resolve the coverage litigation while knowing Ross Law Group was a dissolved entity without funds, unfairly led Carolina Casualty and the court to believe Ross Law Group was the proper defendant, and revealed the truth only after entry of the judgment. (*Id*. at pp. 1189-1194.) Accordingly, the equities overwhelmingly favored affirmance of the trial court's ruling. (*Id*. at p. 1193.)

In short, *Carolina Casualty* ruled that it was within the court's discretion to amend the judgment to include an individual because he, not his defunct law firm, was actually the one controlling the litigation, and he failed to disclose that the law firm had no assets. Here, it was within the court's discretion to amend the judgment to include the trust (technically, the Azaris as trustees) because the trust (and the Azaris as trustees), not Azari as an individual, was actually controlling the litigation, and Azari failed to disclose that he had no assets.

To similar effect is *Carr, supra,* 23 Cal.App.4th 14. There, the plaintiff obtained a judgment against a corporation (Barnabey's), whom she believed owned the hotel where she worked. (*Id*. at pp. 16-17.) Throughout the trial on the merits, Barnabey's defended against her claims. At the trial on punitive damages, however, there was testimony that Barnabey's had never held title to the hotel, stopped doing business before the plaintiff was hired, and had no assets and no source of income, and that the true owner of the hotel was a limited partnership (Peppercorn). (*Id*. at pp. 18, 20.) The trial court added Peppercorn to the judgment as a judgment debtor. (*Id*. at p. 20.) The appellate court affirmed, concluding that the conduct of Peppercorn (whose personnel overlapped with

12

Barnabey's) approached a fraud on the court: when the plaintiff mistakenly sued Barnabey's, Barnabey's did not say anything about the mistake, acted as if it was a proper defendant, and sought to shield the entity (Peppercorn) that should have been named. (*Id*. at pp. 20-21.) Although there was insufficient evidence to find that Peppercorn was Barnabey's alter ego or that Peppercorn's identity had been actively concealed from the plaintiff, equity justified the amendment of the judgment. (*Id*. at pp. 21-23.) Here too, whether or not Azari and the Azari Trust trustees were or are alter egos, equitable principles justify the affirmance of the court's order in this case.

Appellants argue that denying the motion to amend the judgment would not have sanctioned a fraud or promoted injustice. They urge that Azari's trial testimony regarding his finances, and his attorney's depiction of his financial condition, pertained to his finances in 2006 (when Azari was not making his payments to BP) and perhaps 2007, not at the time of trial. They urge that the transfer of the property occurred before the lawsuit, and the Smith Letter was not an attempt by Azari to avoid enforcement of the judgment. However, it is not our role to reweigh the evidence; our review is merely for substantial evidence and abuse of discretion. For our reasons stated *ante*, the evidence was sufficient and there was no abuse of discretion.[6]

The court did not err in granting BP's motion to amend the judgment.

C. *The Amended Judgment Is Not Void*

Appellants contend they were trustees when BP commenced the litigation against Azari in February 2010, but by the time the judgment was amended, they had appointed ICM as trustee in their stead. They argue that the amended judgment is void because the trustees (ICM or the Azaris in their capacity as trustees) were not served with a summons or with the motion papers on BP's motion to amend. Appellants are incorrect.

---

[6]   Azari also argues that BP could still satisfy all or part of the judgment by enforcing the deed of trust on the station property, which Azari represented "could net $1.2 million." But the property was sold at a foreclosure sale for $*100*. That left a deficiency of over $700,000, for which the court has entered a deficiency judgment.

13

In the first place, section 187 does not require that the party being added to the judgment have its own day in court to defend against the plaintiff's claims. (*Greenspan, supra,* 191 Cal.App.4th at p. 508.) Instead, it is sufficient if the proposed judgment debtors (Azaris as trustees) are in effect identical to the original judgment debtor (Azari), the action was fully and fairly tried, and nothing appears in the record to show that the proposed judgment debtor could have produced evidence that would have affected the results of the litigation. (*Id.* at p. 509.) Here, the Azaris as trustees were in effect identical to Azari (as we discuss, *ante*), there is no assertion that the action was not fully and fairly tried, and there is no indication that the litigation would have had a different outcome if the Azaris as trustees had been named parties to the lawsuit. Indeed, Azari zealously protected the Azari Trust's interests.

Furthermore, we find no significance to the fact that BP's motion to amend was not served on the Azaris as trustees, or on ICM, based on the record in this case. Azari was served with the motion papers, and even if he was technically served in his individual capacity, there is no indication that the Azari Trust, through its trustees, lacked notice of the proceeding or would have asserted any evidence or argument other than what Azari asserted. Azari vigorously opposed the motion to add Azari and his wife in their trustee capacity (thus protecting the Azari Trust assets), and both Azari and his wife submitted declarations in opposition to the motion. There is no indication whatsoever that the Azari Trust or its trustees did not receive meaningful notice and opportunity to be heard in regard to BP's motion to amend the judgment.

Appellants fail to establish error.**7**

---

**7** Appellants also argue that the requirements for adding judgment debtors under Code of Civil Procedure section 989 et seq. were not met. However, BP did not proceed under section 989, but under section 187.

14

III.  <u>DISPOSITION</u>

The order is affirmed.

_____
NEEDHAM, J.

We concur.

_____
JONES, P.J.

_____
SIMONS, J.